1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SWINGLESS GOLF CLUB CORPORATION,
a Wyoming corporation,

        Plaintiff,

  v.

ROY H. TAYLOR, individually and d/b/a
CENTERFIRE GOLF COMPANY, and
JAMES S. STOWELL, an individual, JACK
GALANTI, an individual, MIKE STRINGER,
an individual, CENTERFIRE GOLF
COMPANY, a California corporation, NEW
RIVER INDUSTRIES CORP., EZEE GOLF
LLC, a Delaware limited liability company,
and STEVE FLUKE, an individual,

        Defendants.

_____/

ROY H. TAYLOR, JAMES S. STOWELL, an
individual, JACK GALANTI, an individual,
MIKE STRINGER, an individual, STEVE
FLUKE, an Individual,

        Counterclaimants,

  v.

SWINGLESS GOLF CORPORATION, A
Wyoming Corporation, JAMES DEPORCHE,
an individual, and JOYCE TAYLOR, an
individual, and DOES 1–25,

        Counterdefendants.

_____/

No. C 08-05574 WHA

**ORDER GRANTING
SUMMARY JUDGMENT
ON COUNTERCLAIMS**

**United States District Court**
For the Northern District of California

**INTRODUCTION**

The Court once again turns its attention to the "swingless" golf club: a pyrotechnic device that uses explosive charges, a wedge-shaped piston, and a trigger to blast golf balls hundreds of yards down a fairway. Designed for golfers who cannot (or would rather not) swing, this intriguing invention — which looks like a traditional golf club except that it is loaded with gunpowder — stands at the heart of this dispute.

The instant motion targets the four remaining counterclaims in this action. In short, counterdefendants Swingless Golf Corporation ("SGC"), James DePorche, and Joyce Taylor move for summary judgment on counterclaims of fraud, conversion, corporate waste, and breach of fiduciary duty asserted by counterclaimants Roy Taylor, James Stowell, Jack Galanti, Mike Stringer, and Steve Fluke. For the reasons set forth below, the motion is **GRANTED**.

**STATEMENT**

**1.    THE INVENTION**

In 1992, defendant and counterclaimant Roy Taylor created several inventions relating to the "ballistic impeller club." The ballistic impeller club was designed for people who wanted to participate in the game of golf but lacked the requisite strength, skill, or desire to actually swing a club (R. Taylor Decl. ¶ 2). Four patents were issued to Mr. Taylor covering various components of this invention, including U.S. Patent No. 5,924,932, No. 5,816,927, No. 5,522,594, and No. 6,139,440 (*id.* at ¶ 3). Perhaps recognizing that "ballistic impeller" lacked a marketable ring, the product soon became known as the swingless golf club.

**2.    SWINGLESS GOLF CORPORATION**

Mr. Taylor incorporated SGC in California in April 1999 (*id.* at ¶ 4; J. Taylor Decl. Exh. A; Arthur Decl. ¶ 3). Among the three directors present at the first board of directors meeting held in Fremont on May 12, 1999, were Roy Taylor and his then-wife Joyce Taylor.[1] At the meeting, Roy Taylor was selected as chairman of the board and Joyce Taylor served as secretary. Shortly thereafter, Roy Taylor hired Robert Arthur as corporate counsel for SGC (*id.* at ¶ 5;

_____

[1] Roy and Joyce Taylor were married to each other twice. The first marriage began in 1973 and lasted for two years. They married again in 1977 or 1978, and divorced in 2002 (J. Taylor Decl. ¶ 2). They are now on opposite ends of this lawsuit.

United States District Court
For the Northern District of California

1   Arthur Decl. ¶ 2).  The board meeting minutes, which were signed by both Roy and Joyce Taylor,

2   set forth the following relevant information (J. Taylor Decl. Exh. A):

| Name | Number of Shares | Consideration and (if other than cash) Fair Value |
|------|------------------|---------------------------------------------------|
| Roy H. Taylor and Joyce Taylor, as community property | 150,000 | Expense Reimbursement |
| Roy H. Taylor and Joyce Taylor, as community property | 5,100,000 | Patent Rights Assignment |

9   As shown, Roy and Joyce Taylor received — as community property — 5,100,000 shares

10  of SGC stock as consideration for the assignment of their patent rights to the new corporate

11  entity.  They also received 150,000 shares of SGC stock as reimbursement for expenses  (*id.* at ¶

12  5).  An additional 5,250,000 shares in SGC were issued to Roy and Joyce Taylor — again as

13  community property — two years later in May 2001 (*ibid.*; Arthur Decl. ¶ 4, Exh. E).  In total,

14  Roy and Joyce Taylor received 10,500,000 shares of SGC stock prior to their divorce in 2002.

15  This amounted to a 60% ownership stake in the company (Arthur Decl. Exh. E).

16      **3.      INVESTOR JAMES DEPORCHE**

17      With the swingless golf club supposedly nearing "production-ready" status, Roy Taylor

18  approached a former co-worker, James DePorche, to invest in SGC in mid-June 2001.  Mr.

19  DePorche, who is a counterdefendant in this action (along with Joyce Taylor), agreed to invest

20  capital in SGC.  He received — with the assent of Roy Taylor and the board of directors —

21  4,900,000 shares as consideration for his investment (*id.* at ¶5; DePorche Decl. ¶ 3).  This

22  amounted to a 28% ownership stake in SGC.

23      **4.      JACK GALANTI, STEVE FLUKE, AND MIKE STRINGER**

24      Starting around 2001, Jack Galanti and Steve Fluke — who, like Roy Taylor, are both

25  defendants and counterclaimants in this action — began helping with the development of the

26  swingless golf club (J. Taylor Decl. ¶ 6).  In addition to his commitment of time and efforts, Mr.

27  Fluke claims to have invested $7,500 in SGC (Fluke Decl. ¶ 4).  A stock dispute, however, arose

28  between Roy Taylor and these two contributors in late 2001 (Arthur Decl. ¶¶ 6–8; DePorche

3

United States District Court

For the Northern District of California

Decl. ¶ 4).  According to Mr. Galanti and Mr. Fluke, Roy Taylor orally promised to issue ten percent of SGC's stock to Mr. Galanti in exchange for his work in moving the swingless golf club to production (Fluke Dep. 32; Arthur Decl. ¶ 6).  Mr. Fluke similarly alleged that eight or ten percent of SGC's stock was promised to him for his efforts (Fluke Decl. ¶ 5).  Roy Taylor denied ever making such promises when this dispute was brought to the attention of SGC corporate counsel (Arthur Decl. ¶ 8).

With the assistance of Robert Arthur, SGC's corporate counsel, Roy Taylor prepared written counter-offers to the demands of Mr. Galanti and Mr. Fluke (Arthur Decl. Exhs. A and B). Mr. Fluke eventually accepted an SGC counter-offer and received shares in SGC for his work on the swingless golf club (*id.* at ¶ 8; DePorche Decl. ¶ 4, Exh. A).  Mr. Galanti, however, refused to accept anything less than a ten percent stake in the company.  Due to this impasse, SGC released Mr. Galanti from his services in January 2002 (DePorche Decl. ¶ 4; Arthur Decl. ¶ 8).

In August of 2003, a similar dispute arose with another contributor to SGC, Mike Stringer. Like Roy Taylor, Mr. Stringer is also a defendant and counterclaimant in this action (DePorche Decl. ¶ 10).  A stock and compensation agreement was reached between SGC and Mr. Stringer shortly thereafter (*id.* at Exh. E).

### 5.   JOYCE TAYLOR'S ROLE IN SGC

Roy and Joyce Taylor were still married to each other until 2002.  While they were married, there were occasional SGC meetings held at their home (J. Taylor Decl. ¶ 7).  Joyce Taylor, who is a counterdefendant, held the position of corporate secretary (R. Taylor Decl. ¶ 7). As corporate secretary, Joyce Taylor initially tried to attend SGC business meetings and take notes.  Roy Taylor, however, quickly began telling his then-wife to "go upstairs unless food and snacks were needed," making it clear that he did not want her involved in the business (J. Taylor Decl. ¶ 7).  Thereafter, Joyce Taylor ceased trying to be at the table when SGC meetings were held.  She served — in her words — as merely a "waitress" (*ibid.*).  Mr. Stringer corroborated this characterization, stating that "Joyce Taylor . . . never used to attend meetings, so to speak, but she would be there providing food" (Stringer Dep. 14).

**United States District Court**
For the Northern District of California

**6.** **THE DIVORCE AND TRANSFER OF INTELLECTUAL PROPERTY TO SGC**

In 2002, Joyce Taylor discovered that her then-husband, Roy Taylor, had been "fooling around" with her son's wife (J. Taylor Decl. ¶ 9). Divorce proceedings ensued in May 2002, with Roy Taylor announcing that he would be marrying his daughter-in-law and moving to Mississippi to be near his ailing mother (DePorche Decl. ¶ 5; Arthur Decl. ¶ 9; R. Taylor Decl ¶ 14).

Upon learning about the impending divorce proceedings between the majority shareholders, Attorney Arthur discussed with Mr. DePorche the due diligence that needed to be conducted to ensure that SGC's affairs remained in order (DePorche Decl. ¶ 6; Arthur Decl. ¶ 9). In carrying out this due diligence, Attorney Arthur learned that Roy Taylor had never assigned his swingless golf club patents to SGC. An assignment agreement was thereafter prepared by Attorney Arthur to ensure that the patents rights were assigned to the company. The agreement was signed by Roy Taylor on June 8, 2002 (Arthur Decl. ¶ 10, Exh. C).

A separate set of agreements were also prepared by Attorney Arthur entitled "Confidential Information and Invention Assignment Agreement." These agreements — which will simply be called "IP agreements" herein — were created by Attorney Arthur to protect SGC's intellectual property, including its trademarks and trade secrets. Roy Taylor signed an IP agreement on November 15, 2002 (DePorche Decl. ¶ 7, Exh. B; Arthur Decl. ¶ 9). Other SGC principals, including Mr. DePorche, Joyce Taylor, Mr. Fluke, and Mr. Stringer, also signed IP agreements (DePorche Decl. ¶ 7, Exhs. C and D). Principals were not allowed to remain with the company if they refused to sign the IP agreement (Fluke Decl. ¶ 7).

According to Roy Taylor, however, when he signed both the patent assignment agreement and the IP agreement, he believed — as he had since he created the company in 1999 — that he and SGC "were the same" and therefore it "did not matter whether the patents were in [his] name or under" the company's name (R. Taylor Decl. ¶ 12). In his own words, he transferred his patent rights to SGC to "bring a feeling of trust among the other members of SG[C]" (*id.* at ¶ 13).

Late in the fall of 2002, the divorce between Roy and Joyce Taylor was finalized. The 10,500,000 shares of SGC stock the couple had previously held as community property were split evenly between them (J. Taylor Decl. ¶ 9; DePorche Decl. ¶ 8; Arthur Decl. ¶ 12). As a result of

5

this split, Roy and Joyce Taylor each owned approximately 30% of SGC.  Shortly thereafter, sometime between November 2002 and early 2003, Roy Taylor moved with his daughter-in-law (who had also gotten a divorce) to Byhalia, Mississippi.

### 7.    ROY TAYLOR'S REMOVAL FROM THE SGC BOARD AND MANAGEMENT

Following Roy Taylor's relocation to Byhalia, SGC employees — including Mr. Fluke and Mr. Stringer — continued to use the home of Joyce Taylor to work on the swingless golf club (J. Taylor Decl. ¶ 11).  Mr. DePorche would also occasionally use Joyce Taylor's home to conduct SGC-related conference calls with Roy Taylor (*ibid.*).

In August 2003, as the swingless golf club reached production-ready status, Mr. Fluke brought in a new monetary investor for SGC, Donn Mulder (Fluke Decl. ¶ 4).  Mr. Mulder invested $14,000 in capital to fund production of the product (J. Taylor Decl. ¶ 12; DePorche Decl. ¶ 13).  On behalf of SGC, both Mr. Fluke and Mr. DePorche promised Mr. Mulder that the swingless golf club would be made and manufactured in the Bay Area of Northern California (DePorche Decl. ¶ 13).[2]

That same month, however, Roy Taylor began seeking to manufacture parts for the swingless golf club in Mississippi and Tennessee.  By August 2003, he had already assembled one hundred golf club handles (R. Taylor Decl. ¶ 136).  A conference call was arranged and held between Roy Taylor in Mississippi and Mr. DePorche, Joyce Taylor, Mr. Stringer, Mr. Fluke, and Cameron Lozada (who was another shareholder and director of SGC) in California to discuss where the product would be manufactured (*id.* at ¶ 15).  During the call, Roy Taylor announced that he had begun and intended to continue manufacturing parts for the swingless golf club with his daughter and son-in-law — defendant and counterclaimant James Stowell — "back east."[3] When Roy Taylor was informed that this was expressly contrary to investor expectations, he told the other participants in the conference call "F*ck the investor(s), we'll do whatever we want" and "that's the way its going to be, it's not open for discussion" (*ibid.*; J. Taylor Decl. ¶ 13).

---

[2]  The record is unclear as to whether this was an oral or written promise.

[3]  Mr. Stowell was not an SGC shareholder — a point that is relevant to the instant motion (Arthur Decl. Exh. E; R. Taylor Dep. 28).

United States District Court
For the Northern District of California

1    Counterclaimants' recollection of this conference call varies slightly.  According to Mr.

2    Taylor and Mr. Fluke, "[t]he majority of the phone call was spent abusing, harassing and

3    inflaming [Roy Taylor] for the lack of progress on the search for an 'investor'" (R. Taylor Decl. ¶

4    17; Fluke Decl. ¶ 8).  Both, however, concede that during the conference call, Roy Taylor

5    heatedly exclaimed "'F*** investors' we have to get this done" (R. Taylor Decl. ¶ 18; Fluke

6    Decl. ¶ 9).  Roy Taylor claims that he was never given an opportunity to apologize or to make

7    clear that his comment was not directed to any specific investors (R. Taylor Decl. ¶ 19).

8    In any event, following this conference call, Mr. DePorche grew concerned about

9    financial obligations that Roy Taylor would impose on SGC by entering into contracts with

10   machine shops in Mississippi and Tennessee (DePorche Decl. ¶ 15).  On September 1, 2003, a

11   majority of SGC shareholders voted to remove Roy Taylor as a director of SGC (J. Taylor Decl. ¶

12   14).  Signatories to the "Written Consent of Shareholders" included Mr. Lozada, Mr. Fluke, Joyce

13   Taylor, Mr. DePorche, and Mr. Stringer (DePorche Decl. at Exh. G).[4]  That same day, Joyce

14   Taylor, Mr. DePorche, and Mr. Lozada held a board of directors meeting and voted to remove

15   Roy Taylor as Chief Executive Officer of SGC, appointing him instead as "Technical Advisor"

16   (*id.* at Exh. H).  The meeting minutes justified this move as follows (*ibid.*):

17       The specific comment, "F___ the Investor[,]" . . . led to a concern
         that new investor(s) funds needed to be protected from mis-use
18       which could lead to litigation against the company.  Roy Taylor's
         added statements about moving the company's operations to
19       Mississippi and heavily involving his son-in-law in day-to-day
         operations were contrary to all prior expectations of the existing
20       shareholders and investors.  Finally, his statements about working
         with machine shops in Mississippi and nearby states[] led to
21       concerns of unwanted financial obligations.

22   The board also voted to open a new corporate bank account for "deposit and safekeeping of new

23   investor(s) funds" (*ibid.*).

24   Sometime thereafter, Mr. Fluke and Mr. Stringer switched their alliances.  They left (or

25   were removed from) SGC, and joined Roy Taylor in a separate venture (J. Taylor Decl. ¶¶ 15–16;

26   

27       [4] Note well that many counterclaimants in the instant action were signatories to Roy
     Taylor's removal from SGC's board.  Mr. Fluke, however, claimed that he was "pressured"
28   by Mr. DePorche and Joyce Taylor to remove Roy Taylor as a director, although no details
     as to how he was pressured were provided (Fluke Decl. ¶ 11).

DePorche Decl. Exh. K).  According to Mr. Fluke, he was "removed" from SGC in a "fraudulent

fashion" due to "misrepresentations" by counterdefendants including (Fluke Decl. ¶ 14):

> SG[C] would operate more efficiently without [his] presence,
> although [he] was donating [his] time without pay[,] the monies
> would be used in a manner that was controlled and efficient[,]
> marketing and sales of the golf club would be accomplished better
> with less people managing the customers[,] costs for the company
> would be controlled with less personnel participating[,] success of
> patents and the company would be faster in development[,] and
> patents would be protected because Jim DePorche and Joyce
> Taylor were the only controllers.

Mr. Fluke never explains, however, how it was possible that he "relied" upon these alleged

"misrepresentations" when he was removed, or how these alleged "misrepresentations" were

false.  He also never explains when or where these alleged "misrepresentations" were made.

### 8.   THE FIRST SWINGLESS GOLF CLUBS ARE SOLD

Despite these various distractions involving Roy Taylor and other counterclaimants, SGC

launched a website, created promotional photos and videos of the product, and began selling the

product online (De Porche Decl. ¶ 17).  Of the 25 clubs that the company could assemble using

available funds, all but a few (reserved for demonstrative purposes) were sold.

### 9.   SGC SUES ROY TAYLOR IN STATE COURT

Following his removal as a director and CEO of SGC, Roy Taylor unilaterally "assigned"

the '932 and '594 patents back to himself and then to New River Industries, a Mississippi

corporation that he founded and controlled (DePorche Decl. ¶ 18; R. Taylor Decl. ¶ 30).  Roy

Taylor also "assigned" the registered trademark "Swingless" to himself as well (R. Taylor Decl. ¶

30).  Thereafter, SGC filed a lawsuit against Roy Taylor in California Superior Court to reverse

these transfers (*id.* at ¶ 19).  Following a slew of failed settlement efforts, SGC obtained a

judgment in its favor in August 2005 (*id.* at ¶ 20, Exh. J).  It took, however, until May 2006 for

the USPTO to restore ownership of the patents and other intellectual property rights to SGC.

Roy Taylor's version of these events differs slightly.  Although he fully admits to

executing these purported transfers, he claims that both sides actually reached a settlement in the

state court action in March 2005.  According to Roy Taylor, in exchange for returning the '932

and '594 patents to SGC, the settlement agreement provided that he would be "reintegrated in

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    SG[C] at the Board level and [he would] be paid royalt[ies]" (R. Taylor Decl. ¶¶ 30–32).[5]

2    Despite this claim, Roy Taylor acknowledges that it was "the Court [that] ordered the transfer" of

3    the aforementioned patents and intellectual property back to SGC (*id.* at ¶ 31).

4        **10.    REINCORPORATION OF SGC IN WYOMING**

5        In 2006, Mr. DePorche and the SGC board grew concerned that the annual California

6    franchise fees of $800 and other requirements for corporations domiciled in California were too

7    costly for the corporation (*id.* at ¶ 22).  As such, the board decided to domicile the corporation in

8    Wyoming, where franchise fees were only $50 per year (*ibid.*).  SGC's corporate counsel Robert

9    Arthur assisted SGC in performing a "standard re-incorporation" in Wyoming, and advised the

10    company on how to provide notice of the re-incorporation to existing SGC shareholders (Arthur

11    Decl. ¶ 19; Exh. D; DePorche Decl. ¶ 23).  Attorney Arthur explained to the board that each

12    shareholder in SGC would have the same number of shares and ownership stake in the new entity.

13    The reincorporation proceeded on the supposed authority of both Joyce Taylor and Mr. DePorche,

14    who collectively held a majority of shares in SGC.  Both voted to reincorporate the business in

15    Wyoming (Arthur Decl. ¶ 19; DePorche Decl. ¶ 23).  The company did not consult Roy Taylor or

16    Mr. Fluke on the reincorporation, and did not provide them with a chance to oppose it (R. Taylor

17    Decl. ¶¶ 35, 37).

18        The new Wyoming entity was called Swingless Golf Club Corporation ("SGCC").

19    Notices of the reincorporation were mailed to all former SGC shareholders by Joyce Taylor on

20    August 31, 2006 (J. Taylor Decl. ¶ 18).  The notices informed these shareholders that they "will

21    have the same quantity of shares in [SGCC]" as they did in SGC (*id.* at Exh. C).  According to

22    Attorney Arthur, all former shareholders of SGC were *in fact* issued the same quantity of shares

23    (and retained the same percentage ownership) in SGCC as they had held in SGC prior to its

24    dissolution (Arthur Decl. ¶ 21, Exh. E).

25        Despite this assertion by Attorney Arthur (who was inexplicably never deposed by

26    counterclaimants), both Mr. Taylor and Mr. Fluke state in their declarations that they were *not*

27

28            [5]  This purported settlement agreement was not provided by counterclaimants as an
     exhibit to any of their declarations.

9

United States District Court

For the Northern District of California

issued any shares in SGCC (R. Taylor Decl. ¶¶ 36, 38; Fluke Decl. ¶ 27).  Mr. Fluke explained

this belief during his deposition (Fluke Dep. 61–62):

> Q:    Is it your contention that you own no shares in Swingless-Wyoming?
>
> A.    Yes.
>
> Q.    What led you to that conclusion?
>
> A:    I don't believe I have been given anything, and with regards to Swingless Golf-Wyoming, once the old Swingless Golf Corporation was closed down illegally, anything from that point on I never treated seriously, to be perfectly frank.

Mr. Fluke further explained that he didn't "even recognize [SGCC] as a real company[,]" calling

it a "kangaroo company" (*id.* at 70).  In other words, Mr. Fluke's belief that he was not issued

shares in SGCC stems from his belief that SGCC was never a real company to begin with.

As for Roy Taylor's statement that he was not issued shares in SGCC, it is contradicted by

a letter he wrote in December 2006 to Mr. DePorche in which he expressly acknowledged receipt

of the August 31 reincorporation notice regarding "a stock exchange" (Jacobson Reply Decl. Exh.

A).  In any event, neither Roy Taylor nor Mr. Fluke have personal knowledge as to whether they

were actually issued shares in SGCC, since they have never been involved in its affairs.[6]

**11.    FURTHER "REASSIGNMENTS" OF THE SWINGLESS GOLF PATENTS**

Roy Taylor's unilateral assignment of SGC intellectual property in September 2003 was

followed by another "assignment" of SGCC patents in 2007 (DePorche Decl. ¶ 25).  The USPTO

transferred them back to SGCC in June 2009.  In September 2009, Roy Taylor again attempted —

for the third time — to "assign" SGCC patents to himself (*ibid.*).  It is unclear whether this

assignment has yet been reversed.

＊                       ＊                       ＊

SGCC initiated this lawsuit on December 15, 2008, against Roy Taylor, Steven Fluke,

Mike Stringer, Jack Galanti, James Stowell, and a number of corporate defendants including EZee

Golf LLC, which supposedly makes its own competing version of the swingless golf club (Dkt.

---

[6] For these reasons, counterdefendants' evidentiary objections targeting these statements are **GRANTED** (Dkt. No. 105)

No. 1).  Defendants fired back with eight counterclaims, which were cut in half by a motion to dismiss filed in November 2009 (Dkt. No. 85).[7]  The four surviving counterclaims — covering fraud, conversion, corporate waste, and breach of fiduciary duties — are the subject of the instant motion.

**ANALYSIS**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

In resolving a summary judgment motion, all reasonable inferences must be drawn in the light most favorable to the non-moving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, unsupported conjecture or conclusory statements are insufficient to defeat summary judgment.  *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008); *see also Nilsson v. City of Mesa*, 503 F.3d 947, 952 n. 2 (9th Cir. 2007) (explaining that a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact").

As explained below, counterclaimants have failed to meet their burden of showing a genuine issue for trial on any of their remaining counterclaims.

**1.    FRAUDULENT INDUCEMENT**

Counterclaimants' fraudulent inducement counterclaim requires proof of the following five elements: (1) misrepresentation, (2) knowledge of the falsity of the representation, (3) intent to induce reliance, (4) justifiable reliance, and (5) resulting damages.  *Stewart v. Ragland*, 934 F.2d 1033, 1043 (9th Cir. 1991).

---

[7]  While counterclaimants were invited to seek leave to amend the dismissed counterclaims, they chose not to do so.

1    Counterclaimants alleged that Mr. DePorche and Joyce Taylor fraudulently induced them

2    to transfer their intellectual property rights to SGC (via the patent assignment agreement and IP

3    agreements) by convincing them that the transfer would be in the best interests of the company

4    (Ans. ¶¶ 28, 29, 63–67).  According to counterclaimants, this was false because Mr. DePorche

5    and Joyce Taylor intended all along to "take control of the company and dissolve it and establish

6    a new company where they would be the sole [shareholders] and would control the patents and all

7    subsequent designs arising from [Roy] Taylor's own designs" (*id.* at ¶ 32).  As part of this alleged

8    fraud, Mr. DePorche and Joyce Taylor then "systematically removed all defendants from

9    employment with [SGC] . . . in August 2003, which fraudulently precluded defendants from using

10   the intellectual property that they personally developed" (*id.* at ¶¶ 31, 67).

11   Bare allegations, however, cannot defeat a motion for summary judgment.  While this

12   normally goes without saying, it is emphasized here because the opposition brief inexplicably

13   recites the legal standard for a *motion to dismiss* and argues that "the Court must assume that the

14   [counterclaimants'] allegations are true" (Opp. 15).  We are, however, well beyond the motion to

15   dismiss stage.  We are on summary judgment.  At this stage, a summary judgment motion *must* be

16   opposed with admissible evidence.  Mere allegations are *not* admissible.

17   In their motion, counterdefendants have easily met their initial burden of showing that the

18   above allegations lack factual support.  As set forth in numerous supporting declarations and

19   exhibits, counterclaimants have shown that Roy Taylor — a the very first SGC board meeting —

20   promised to assign his patents to SGC as consideration for the shares he was issued.  The

21   assignment agreement he later executed was a belated fulfillment of that earlier promise.  The

22   same evidence also shows that the execution of the IP agreements and removal of Roy Taylor

23   from the board of directors and management was done to protect the interests of the corporation

24   and its investors.  Finally, counterclaimants have produced evidence showing that all former

25   shareholders of SGC received an equal number of shares in SGCC — thus negating the allegation

26   that Mr. DePorche and Joyce Taylor schemed to be the "sole shareholders" of SGCC.

27   In response, counterclaimants have produced no admissible evidence showing a genuine

28   issue of material fact for trial.  *See Nissan Fire & Marine Ins. Co.*, 210 F.3d 1099, 1102 (9th Cir.

2000).  *First*, with respect to Mr. Stowell, Mr. Stringer, and Mr. Galanti, no declarations whatsoever were provided from these counterclaimants.[8]  As such, there is no admissible evidence showing that any of these three counterclaimants relied upon any alleged "misrepresentations" or even suffered any harm.  Such reliance cannot be "vouched for" by Roy Taylor or Mr. Fluke, as they do not have firsthand knowledge to make such statements.

   *Second*, counterclaimants have produced no admissible evidence showing that Mr. Stowell or Mr. Galanti even signed an IP agreement or owned any shares in SGC.  Indeed, there is no evidence that Mr. Stowell was even present for these events.

   *Third*, with respect to the two counterclaimants who *have* submitted sworn declarations — Roy Taylor and Steven Fluke — their declarations contained only bare and conclusory statements that they were defrauded.  For example, Roy Taylor's declaration states that "DePorche induced me to transfer the patent rights to SG[C] under conditions that turned out to be false pretenses" and "under the same conditions, [he] induced me to transfer other non-patent intellectual property rights including trade secrets to SG[C]" (R. Taylor Decl. ¶¶ 10–11).  That's it.  No details are provided in his declaration as to what "misrepresentations" were actually made by Mr. DePorche to "induce" Roy Taylor to sign these documents, or how such "misrepresentations" were false.  All Roy Taylor provides in his declaration are legal conclusions couched as factual statements.[9]

   *Fourth*, Roy Taylor's own declaration affirmatively concedes that he did not rely on any "inducements" by Mr. DePorche when he signed the patent assignment agreement.  In his sworn declaration, Roy Taylor states (R. Taylor Decl. ¶¶ 12–13):

> Since the beginning of SG[C] in 1999 to 2003, I believed SG[C] and I were the same . . . therefore [it] did not matter whether the patents were in my name or under SG[C]. . . . I transferred the patents to SG[C] to bring a feeling of trust among other members of SG[C].

---

   [8] While a four-page excerpt from Mr. Galanti's deposition was attached to the opposition brief, the testimony therein was irrelevant to any of the counterclaims addressed by this motion.

   [9] For these reasons, counterdefendants' evidentiary objections targeting these statements are **GRANTED** (Dkt. No. 105).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

In other words, Mr. Taylor didn't sign the patent assignment agreement because of any supposed "misrepresentations." He signed the agreement because he believed it "did not matter" whether the intellectual property was in his name or the company's name. Morever, he wanted to "bring a feeling of trust" among SGC members. In sum, no admissible evidence supports Roy Taylor's counterclaim that he was fraudulently induced by Mr. DePorche to sign the patent assignment agreement or the IP agreement.

*Fifth*, Mr. Fluke's fraud counterclaim similarly fails. In his declaration, Mr. Fluke states was that he "was removed from SG[C] through conspiration [sic] and fraudulent fashion [sic] through a variety of misrepresentations including but not limited to" (Fluke Decl. ¶ 14):

> SG[C] would operate more efficiently without [his] presence, although [he] was donating [his] time without pay[,] the monies would be used in a manner that was controlled and efficient[,] marketing and sales of the golf club would be accomplished better with less people managing the customers[,] costs for the company would be controlled with less personnel participating[,] success of patents and the company would be faster in development[,] and patents would be protected because Jim DePorche and Joyce Taylor were the only controllers.

Nowhere in his declaration does Mr. Fluke reveal, however, *who* made these supposed "misrepresentations," when they were made, or where they were made. Mr. Fluke's declaration also fails to explain why these alleged "misrepresentations" were *false* or how he relied upon them when being "removed from SG[C]." Again, simply calling a statement "fraudulent" does not make it so.[10]

*Sixth*, turning to the IP agreement he signed, Mr. Fluke's statement that he was "coerced" into signing the agreement is similarly devoid of any factual details surrounding the alleged coercion. He does not explain how he was "coerced," what representations were made, and how those representations were false. Again, this is insufficient to survive summary judgment.

In sum, counterclaimants have each failed to meet their burden of producing admissible evidence establishing a genuine issue of material fact on their fraud counterclaim. The anemic argument put forth in the opposition brief that "[t]here are enough facts alleged" to survive

---

[10] Due to its conclusory nature, counterdefendants' evidentiary objection targeting the statement "[f]inally, I was removed from SG through conspiration and fraudulent fashion through a variety of misrepresentations" is **GRANTED** (Dkt. No. 105).

1   summary judgment is based upon an incorrect legal standard (Opp. 10).  Summary judgment on

2   this counterclaim is therefore **GRANTED**.

3       Given this ruling, it is not necessary to decide whether this counterclaim is barred under

4   the applicable three-year statue of limitations or whether the parole evidence rule bars extrinsic

5   evidence relating to the IP agreements.

6       **2.    CONVERSION**

7       To prove conversion, a plaintiff must establish: (1) his ownership of or right to possess the

8   property in question at the time of the conversion, (2) that the defendant disposed of the plaintiff's

9   property rights or converted the property by a wrongful act, and (3) damages.  *Oakdale Village*

10  *Group v. Fong*, 43 Cal. App. 4th 539, 544 (1996).  A plaintiff must also prove that he or she did

11  not consent to the defendant's exercise of dominion over the property in question.  *Band of New*

12  *York v. Fremont General Corp.*, 523 F.3d 902, 914 (9th Cir. 2008).

13      Counterclaimants alleged that they each held shares in SGC, and that — without notice or

14  an opportunity to vote on the issue — SGC was dissolved and reincorporated in Wyoming as

15  SGCC (Ans. ¶¶ 69–71).  According to counterclaimants, they were harmed because they received

16  no value for their SGC shares and no shares in the new entity.  Rather, according to

17  counterclaimants, the only shareholders of SGCC were Mr. DePorche and Joyce Taylor (*id.* at ¶¶

18  72–74).

19      As before, counterdefendants have met their burden of negating these allegations with

20  admissible evidence.  *First*, through sworn declarations and exhibits, counterdefendants have

21  shown that all former shareholders of SGC received an identical number of shares in SGCC that

22  they previously held in SGC.[11]  *Second*, counterdefendants have shown that notice of the

23  dissolution, reincorporation, and exchange of shares *was* provided to shareholders.  *See* Cal.

24  Corp. Code § 1903(c) ("The board shall cause written notice of the commencement of the

25  proceeding for voluntary winding up to be given by mail to all shareholders.").  Indeed, Roy

---

27      [11]  While counterdefendants acknowledge that new stock certificates were not printed
28  and sent to shareholders after reincorporation, this was entirely lawful under Wyoming law.
    Wyoming law clearly states that "[s]hares may *but need not be* represented by certificates"
    for Wyoming corporations  *See* W.S.1977 § 17-16-625 (emphasis added).

Taylor's own letter to Mr. DePorche in December 2006 directly referenced this notice, indicating that he had received it and understood that shares were being "exchanged." *Third*, counterdefendants have established that the dissolution of SGC was approved by both the board of directors and the majority of shareholders. *See* Cal. Corp. Code § 1900(a) ("Any corporation may elect voluntarily to wind up and dissolve by the vote of shareholders holding shares representing 50 percent or more of the voting power."). In sum, counterdefendants have met their burden of gutting the core allegations underlying the conversion counterclaim.

In response, the opposition brief *again* improperly relies upon allegations in the pleadings as "proof" that counterdefendants "did in fact dissolve the original corporation SG[C] without notice to [counterclaimants]" and "in fact failed to issue shares of stock" to counterclaimants (Opp. 11). As stated, allegations are insufficient to create a genuine issue of material fact for trial. Even assuming that counterclaimants — as shareholders — were entitled to the formality of a full shareholder vote on the reincorporation of SGC, there is no admissible evidence that counterclaimants were *damaged* as a result of the reincorporation. Rather, their sole argument for damages is that they were never issued any shares in SGCC — an assertion that is unsupported by any admissible evidence. Additionally, counterclaimants have provided no evidence that either Mr. Stowell or Mr. Galanti even held shares in SGC. Rather, the evidence provided by counterdefendants proves the contrary. As such, these particular counterclaimants lack standing to bring a conversion counterclaim based upon the reincorporation of SGC.

For these reasons, counterclaimants have again failed to show that a genuine issue of material fact exists for trial. Summary judgment on this counterclaim is therefore **GRANTED**.

As an aside, this order will *not* allow counterclaimants to repackage their unjust enrichment counterclaim — which was dismissed over half a year ago — as an additional theory of conversion. Counterclaimants were expressly invited to seek leave to amend their dismissed counterclaims, but chose not to do so. Therefore, this order need not address the merits of counterclaimants' conversion arguments regarding the Roy Taylor's supposed "loan" to SGC and the closure of SGC's corporate bank account following his removal from the board (Opp. 11–12).

United States District Court

For the Northern District of California

### 3.      CORPORATE WASTE

Counterclaimants' corporate waste theory is premised on the alleged misuse by Mr. DePorche and Joyce Taylor of approximately $315,000 in funds invested in SGC by counterclaimants (Ans. ¶ 99). According to counterclaimants, both SGC and SGCC failed to develop the swingless golf club "for many years" and made no attempt to sell the product, thereby "guaranteeing" that investors would not be repaid (*id.* at ¶ 100).

Under California law, liability of directors for failing to perform their duties is limited by "the familiar concept that . . . a director should not be liable for an honest mistake of business judgment." *See* Legislative Comments to Cal. Corp. Code § 309. Thus, for claims like corporate waste, a director can avoid liability altogether by acting "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Cal. Corp. Code § 309(a). Wyoming law contains an analogous statutory provision for Wyoming corporations. *See* W.S.1977 § 17-16-830.

In support of the instant motion, counterdefendants have produced ample admissible evidence demonstrating that the counterclaimants' allegations of corporate waste lack factual support. Specifically, counterdefendants have shown that soon after the swingless golf club became "production-ready" in 2003, SGC attempted to market and sell the product. The company developed a website, created promotional materials, and manufactured 25 clubs. These efforts proved successful, albeit on a small scale commensurate with the funds on hand. Shortly thereafter, however, SGC was forced to divert corporate resources towards protracted litigation with counterclaimant Roy Taylor following his removal from SGC. It took until 2006 — after SGC had fought for and received a state court judgment in its favor — for the patents and related intellectual property to be returned to the company. According to counterdefendants, this stymied any efforts to raise additional investor capital (DePorche Decl. ¶ 21). Soon thereafter, SGC was reincorporated in Wyoming *to save costs*. All of this evidence directly negates counterclaimants' allegations of corporate waste and supports the applicability of the business judgment rule.

United States District Court

For the Northern District of California

1    In response, the opposition brief *again* points to counterclaimants' allegations set forth in

2    the pleadings (Opp. 12–14).  Amazingly, the opposition brief also contains paragraphs copied

3    wholesale from counterclaimants' opposition to the November 2009 motion to dismiss (*compare*

4    Dkt. No. 72 at 7 *with* Opp. 13).[12]  No admissible evidence was proffered in the declarations of

5    Roy Taylor or Steven Fluke to support their allegations of corporate waste.  Moreover, given that

6    Mr. Stowell and Mr. Galanti held no shares in SGC and own no shares in SGCC, they lack

7    standing to even bring allegations of corporate waste against the company.

8        For these reasons, summary judgment on this counterclaim is **GRANTED**.  Given this

9    ruling, this order does not need to address the question of whether an unclean hands defense —

10   based upon Roy Taylor's repeated attempts to "assign" the company's intellectual property to

11   himself — bars the "corporate waste" counterclaim.

12       **4.    BREACH OF FIDUCIARY DUTIES**

13       While the prior counterclaims addressed herein targeted both Mr. DePorche and Joyce

14   Taylor, the breach of fiduciary duties counterclaim targeted only Mr. DePorche.  In their answer,

15   counterclaimants alleged that Mr. DePorche breached his duty to shareholders through a slew of

16   failures, including failing to "ensure that the corporation is operated in a legal manner to ensure a

17   continual business and decisions that are appropriate[,]" "refusing to provide any material data as

18   to the operation of [SGC] to [counterclaimant Roy] Taylor a 30% shareholder[,]" "fail[ing] to

19   provide any accounting or assessment as to the operational condition related to the product line,

20   marketing maintenance of the patents, potential sales, and on going operation of the

21   corporation[,]" and "fail[ing] to hold noticed share holder meetings, issue shares as required,

22   produce any accounting of the business operation, or produce quarterly, or annual reports of the

23   business operations" (Ans. ¶ 60).

24       Under California law, a claim for breach of fiduciary duties requires proof that: (1) Mr.

25   DePorche owed a fiduciary duty to the party in question, (2) the duty was breached, and (3) the

26   breach caused the harm suffered.  *First Interstate Bank of Arizona, N.A., v. Murphy, Weird and*

27   *Butler*, 210 F.3d 983, 986 (9th Cir. 2000).  As a controlling shareholder and director of SGC and

28

_____

[12] This perhaps explains why the opposition brief cites an inapplicable legal standard.

SGCC, there is no question that Mr. DePorche owed fiduciary duties to shareholders, including the duty to protect the interests of minority shareholders. *Jones v. H. F. Ahmanson & Co.*, 1 Cal.3d 93, 110 (1969).

As stated, counterdefendants have put forth substantial evidence showing that they operated SGC and SGCC in a lawful manner — indeed, they relied upon the advice of the very same corporate counsel hired by Roy Taylor himself. Additionally, counterdefendants have produced evidence showing that they properly noticed the reincorporation of SGC, properly issued SGCC shares to former shareholders of SGC, and otherwise made business decisions for both SGC and SGCC in good faith. The same evidence also shows that neither Mr. Stowell nor Mr. Galanti owned shares of SGC or SGCC. Thus, no fiduciary duties were ever owed to them.

In response, the declarations of both Mr. Taylor and Mr. Fluke state that "[Mr.] DePorche . . . dissolved SG[C] without informing or consulting any of the shareholders" of the company (R. Taylor Decl. ¶ 35; Fluke Decl. ¶ 24). Additionally, both declarations state that Mr. Taylor and Mr. Fluke "were not given any opportunity to oppose the dissolution of SG[C]" and received "no annual reports, no notice of shareholders meetings, and no dividends from those shares" (R. Taylor Decl. ¶¶ 37–38; Fluke Decl. ¶ 26–27). Finally, both assert — in statements that have already been deemed inadmissible due to lack of firsthand knowledge — that "SGCC did not issue any shares" to them (R. Taylor Decl. ¶ 36; Fluke Decl. ¶ 27).

Even crediting these statements, there is insufficient evidence for a reasonable jury to find that Mr. DePorche breached any fiduciary duties to counterclaimants. The fiduciary duty of a controlling shareholder to a minority shareholder is based on "powers in trust" and is subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary. *Interactive Multimedia Artists, Inc. v. Superior Court (Allstate Ins. Co.)*, 62 Cal. App. 4th 1546, 1555 (2d Dist. 1998). In other words, majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Directors are bound to similar duties.

Notably absent from counterclaimants' declarations are any facts showing how these actions (or inactions) by Mr. DePorche were done with the intent to benefit majority shareholders

United States District Court
For the Northern District of California

19

United States District Court

For the Northern District of California

1    to the detriment of minority shareholders.  Moreover, neither Roy Taylor nor Mr. Fluke state how

2    they have been *harmed* as a result of these supposed breaches of fiduciary duties, given the

3    undisputed evidence showing that they were issued shares in SGCC.

4        Finally, this order again notes that the opposition brief includes paragraphs cribbed

5    directly from counterclaimants' opposition to the November 2009 motion to dismiss (*compare*

6    Opp. 14 *with* Dkt. No. 72 at 9).  Given that the legal standards differ substantially between a

7    summary judgment motion and a motion to dismiss, this sloppy copying is a substantial reason

8    why counterclaimants' arguments are unavailing.

9        For these reasons, summary judgment on this counterclaim is **GRANTED**

10       **5.      COUNTERCLAIMANTS' RULE 56(f) MOTION**

11       Despite the fact that the parties were ordered to complete all depositions in January 2010

12   and fact discovery in this action closed three months ago (Dkt. Nos. 78, 84), the opposition brief

13   nevertheless argues that a number of depositions are still incomplete and that (Opp. 8) (all errors

14   in original):

15           The depositions are anticipated to present additional extensive
             evidence that support Counter claimants claims and shows that
16           there would be triable issue of material fact, which include but not
             limited to 1) when and how the Counter Claimants were put on
17           notice of Counter Defendants fraud, under what circumstance
             Counter Claimants signed the IP agreement 2) how the actions of
18           Counter Defendants led to conversion of property rights of Counter
             Claimants 3) how the actions of Counter Defendants led to their
19           fiduciary duty 4) what actions led to misuse of investors funds 5)
             how the actions of Counter Defendants were not rational which led
20           to misuse of Counter Claimants/investors funds.

21       FRCP 56(f) states that "[i]f a party opposing [a summary judgment] motion shows by

22   affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the

23   court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained,

24   depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order."

25       This burden has clearly not been met.  *First*, the arguments presented in the opposition

26   brief have not been set forth in affidavit form, as required under FRCP 56(f).  *Second*,

27   counterclaimants have provided no "specific facts" that they hope to elicit from further discovery.

28   *Third*, no reasonable explanation has been provided as to why these depositions were delayed and

United States District Court

For the Northern District of California

1   not taken during the lengthy discovery period, which ended three months ago.  The arguments

2   presented above only show that counsel seek further delays to continue a fishing expedition for

3   any evidence that *might* support the counterclaims alleged.

4       The Rule 56(f) motion is **DENIED**.

5                              **CONCLUSION**

6       For the reasons set forth above, counterdefendants' motion for summary judgment on all

7   remaining counterclaims is **GRANTED**.  Counterclaimants' Rule 56(f) motion to postpone

8   adjudication of the instant motion pending additional discovery is **DENIED**.

9                    *           *           *

10      With no counterclaims remaining for trial, all that is left are SGCC's claims for patent

11  infringement, misappropriation of trade secrets, unfair competition under Section 17200 of the

12  California Business and Professions Code, violation of the Lanham Act, 15 U.S.C. 1125(a), and

13  breach of contract (Dkt. No. 59).  With respect to the patent infringement claim, the parties are

14  reminded that they opted one year ago to forego claim construction and that the jury will be

15  instructed that the terms of the asserted patent claims have their ordinary and customary meaning

16  (Dkt. No. 51).  Since the last date to file dispositive motions — June 7 — has long since passed,

17  all that is left is the final pretrial conference on **SEPTEMBER 6** and a jury trial on **SEPTEMBER 20**.

18      The Court expects all counsel of record to be prepared to try this case on schedule and to

19  know and follow the applicable rules and standards for trial.  No mulligans on summary judgment

20  or discovery will be permitted.  Both sides must be ready to come out swinging.

21

22      **IT IS SO ORDERED.**

23

24  Dated: August 5, 2010.

    _____
    WILLIAM ALSUP
    UNITED STATES DISTRICT JUDGE

25

26

27

28